1            IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
2                      NORTHERN DIVISION

3

4    PAUL DEANTHONY BATTLE                          PLAINTIFF

5    VERSUS              CIVIL ACTION NO. 3:24-cv-00168-MTP

6    HINDS COUNTY DETENTION CENTER, ET AL.         DEFENDANTS

7

8
                          OMNIBUS HEARING
9          BEFORE THE HONORABLE MICHAEL T. PARKER,
             UNITED STATES MAGISTRATE JUDGE,
10                    JUNE 26, 2025,
                   JACKSON, MISSISSIPPI
11

12

13

14   APPEARANCES:

15   FOR THE PLAINTIFF:    PAUL DEANTHONY BATTLE, PRO SE

16   FOR THE DEFENDANTS:    WILLIAM D. BOYD, ESQ.
                           CHARLES E. COWAN, ESQ.
17                         CHARLES W. KIHM, ESQ.

18

19

20

21

     REPORTED BY:
22
        CANDICE S. CRANE, RPR, RCR, CCR #1781
23      OFFICIAL COURT REPORTER
        501 E. Court Street, Suite 2.500
24      Jackson, Mississippi  39201
        Telephone:  (601)608-4187
25      E-mail:  Candice_Crane@mssd.uscourts.gov

EXHIBIT

A

1

## TABLE OF CONTENTS

2    Style and appearances.................................    1

3    Questions by the Court..............................    3

4    Certificate of Court Reporter.........................   44

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

|   |   |
|---|---|
| 1 | **IN OPEN COURT, JUNE 26, 2025** |
| 2 | |
| 3 | THE COURT:  All right.  We're here in the matter of |
| 4 | Paul DeAnthony Battle versus Tyree Jones, Nelson Tyler, John |
| 5 | Scott, Terrell Thornton, James Dotson, and Brittany Milton, |
| 6 | as well as any John Doe defendants.  This case number is |
| 7 | 3:24-cv-168.  This matter is set this afternoon for an |
| 8 | omnibus and screening hearing, and this is a pro se |
| 9 | prisoner-related matter. |
| 10 | Is Mr. Battle present? |
| 11 | THE PLAINTIFF:  Yes, I'm here. |
| 12 | THE COURT:  All right.  Are you Paul DeAnthony |
| 13 | Battle; is that right? |
| 14 | THE PLAINTIFF:  I am. |
| 15 | THE COURT:  All right.  Good afternoon, sir. |
| 16 | THE PLAINTIFF:  Good afternoon. |
| 17 | THE COURT:  And who is here on behalf of the |
| 18 | defendants?  Will counsel identify themselves and the |
| 19 | clients they represent. |
| 20 | MR. BOYD:  Your Honor, William Boyd of Butler Snow |
| 21 | for Tyree Jones, Nelson Tyler, John Scott, and Brittany |
| 22 | Milton. |
| 23 | THE COURT:  Let me catch those again.  You have |
| 24 | Nelson, Scott, Milton, and Tyler? |
| 25 | MR. BOYD:  Yes, Your Honor. |

```
 1          THE COURT:  All right.  Thank you.

 2          MR. COWAN:  Your Honor, Charles Cowan and Charles

 3   Kihm here for Defendant James Dotson.

 4          THE COURT:  Does anybody represent Tyree Jones?

 5          MR. BOYD:  Yes, Your Honor.  I'm sorry.

 6          THE COURT:  All right.  And then we have one

 7   defendant who has never been served, I don't believe.  I

 8   believe that's Thornton, Terrell Thornton.

 9          All right.  Mr. Battle, if you'll come up here to the

10   lectern for me, please, sir.  Will you be okay to stand

11   there and talk with me?

12          It will be easier for me to hear you and talk to you

13   from there.

14          THE PLAINTIFF:  Yes, I will.

15          THE COURT:  All right.  Would you raise your right

16   hand to be sworn, please.

17    (Whereupon, Paul DeAnthony Battle was placed under oath.)

18          THE COURT:  All right.  Mr. Battle, you have filed a

19   lawsuit pertaining to events that occurred while you were

20   incarcerated, and you're filing it without a lawyer.  When

21   that occurs, we have a procedure whereby we bring the

22   plaintiff -- that's the party who filed the lawsuit -- into

23   court and have a hearing like this, so we can make sure we

24   understand what the claim is and to try to get it on track

25   to be resolved.
```

1          As most prisoner-related cases are filed by the

2     prisoners themselves, and they're not lawyers, sometimes

3     it's not clear exactly what they're complaining about and

4     what the issues are and what they want, and so we have this

5     hearing to kind of cut through that.

6          Normally if you were a lawyer, I'd require you to put

7     all that in writing and explain it all.  But as you're not a

8     lawyer, sometimes it's easier just to come in here and talk

9     about it and get a better idea of where we are.

10          Do you understand?

11          THE PLAINTIFF:  Understood.

12          THE COURT:  Now, my name is Mike Parker.  I'm the

13     magistrate judge in your case, which means I'm one of the

14     judges, but I'm -- but there's also another judge in the

15     case, Judge Johnson.

16          When you get materials in this case, there will be a

17     case number on it, and "KHJ" is the district judge and I am

18     the magistrate judge in the case, and we do a little bit

19     different things.  But it's my job as the magistrate judge

20     to screen your claims and try to figure out what they are

21     and to set a schedule to resolve the case.

22          I'll be asking you questions about what you're

23     complaining about and what you're wanting and those kinds of

24     things, and hopefully move it forward if that's what you

25     intend to do.  Is it still your desire to proceed with this

1  case?  I notice you've been released.

2        THE PLAINTIFF:  Yes, it is.

3        THE COURT:  It is, all right.  Well, you have a right

4  to do so.  But, first, have you ever filed a lawsuit like

5  this before?

6        THE PLAINTIFF:  I have not.

7        THE COURT:  You have not, okay.  So let me explain

8  the consent process to you.  When you file a lawsuit in

9  federal court, you have the right to have it decided by the

10  district judge if you so choose, and she's in your case,

11  that's KHJ the initials I explained a while ago, that's

12  Judge Johnson.

13        The parties also have the right, but no obligation,

14  to have the case decided by the magistrate judge if they

15  prefer; that is, have one judge in the case rather than two,

16  and I'm the magistrate judge.  If the parties agree, the

17  magistrate judge can hear all of the case, make all the

18  decisions, and decide it without having a separate judge

19  involved.

20        The parties are not required to do that.  It's

21  optional; both parties have to agree for that to happen.  It

22  happens fairly commonly, though, because the magistrate

23  judges in our court generally are going to handle the

24  prisoner cases.  But you don't have to agree to that.  And

25  if you don't agree to it, you're not punished in any way.

```
1    You don't lose any rights.  You still -- your case moves

2    along, it's just a different person doing it; that's it.

3         No matter which judge hears the case, whether it's

4    the magistrate judge or the district judge, we follow the

5    same rules of evidence, follow the same rules of procedure,

6    and should make the same decision.  No matter which judge

7    hears the case, you still have a right to a trial if the

8    case proceeds that far.  You have the right to appeal if

9    you're dissatisfied with it.

10         Do you understand so far?

11         THE PLAINTIFF:  I do.

12         THE COURT:  Okay.  So -- but you don't have a right

13    to -- I mean, an obligation to consent.  It's purely

14    optional.

15         The same is true on the defense side; you have a

16    right to have the case decided and heard and the final

17    decision made by the district judge.  You also have a right

18    to consent to the magistrate judge.  And if you don't

19    consent, you don't lose any rights.  There's no adverse

20    consequences for anybody.

21         Do you understand?

22         THE PLAINTIFF:  I do.

23         THE COURT:  All right.  Now, how do you want to

24    proceed?

25         If you're willing to consent to the magistrate judge,
```

```
 1    I will hear it if all parties do.  If you'd rather the case

 2    stay with the district judge, that's perfectly fine.  I'm

 3    still going to have this hearing, and the case will go

 4    forward.

 5         THE PLAINTIFF:  I'm willing to consent with the

 6    magistrate judge.

 7         THE COURT:  All right.  And do you do that

 8    voluntarily?

 9         THE PLAINTIFF:  I do.

10         THE COURT:  All right.  And do you have any questions

11    about the process?

12         THE PLAINTIFF:  Not at the moment.

13         THE COURT:  All right.  And do you feel like you've

14    been coerced or forced to do that?

15         THE PLAINTIFF:  No.  I just feel like since you

16    already here, and we can just decide it in your -- while

17    we're here in your court.

18         THE COURT:  All right.  Well, I won't decide the case

19    today, but I'll hear the information necessary to get it

20    started.  Okay?

21         THE PLAINTIFF:  All right.

22         THE COURT:  All right, he consents.  What does the

23    defendant say, though?

24         You have a right to consent or to withhold consent.

25         MR. KIHM:  Officer Dotson consents.
```

1          MR. BOYD:  And no objection from the remaining

2    defendants, Judge.

3          THE COURT:  All right.  You've got to state that

4    another way, though.  It's not a matter of objection; it's a

5    matter of consent.

6          Will they consent?

7          MR. BOYD:  The remaining defendants will consent.

8          THE COURT:  All right.  The form will be handed down

9    for all of you to sign indicating that you intend to do so.

10          Before you sign, though, are you able to read and

11    write?

12          THE PLAINTIFF:  I am.

13          THE COURT:  How far did you go through school?

14          THE PLAINTIFF:  I graduated with a bachelor's degree

15    at Jackson State.

16          THE COURT:  Well, then you can read better than most.

17    I don't get a lot of master's (sic) degrees, so...

18          MS. MITCHELL:  And if you would date it today's date

19    June 26th.  Thank you.

20          THE PLAINTIFF:  You're welcome.

21          THE COURT:  All right.  Thank you.  And I may have

22    misheard you.  Did you say you have a bachelor's degree or a

23    master's degree?

24          THE PLAINTIFF:  Bachelor's.

25          THE COURT:  All right.  And in what, if you don't

1    mind me asking?

2         THE PLAINTIFF:  Business.

3         THE COURT:  Business.  All right, sir.

4         All right.  Let's move forward.  Now, you have filed

5    a lawsuit based on your incarceration.  I think you were at

6    the Hinds County Jail; is that right?

7         THE PLAINTIFF:  That's right.

8         THE COURT:  And why were you there?

9         THE PLAINTIFF:  At the moment, I was -- I was

10   incarcerated because, well, it's an on -- it's an ongoing

11   case because it's still going.  But I was there at that time

12   because I had got pulled over by the Capitol Police and they

13   had -- when they stopped me, they had searched around the

14   scenes and found some drugs and a gun I think, and they

15   charged me with it.  And that's when I got -- went to jail

16   that day.

17        THE COURT:  All right.  They charged you with what?

18   I'm sorry.

19        THE PLAINTIFF:  Well, they charged me with

20   possession.

21        THE COURT:  Possession of controlled substance?

22        THE PLAINTIFF:  Yes.

23        THE COURT:  All right.  And so you were arrested and

24   brought to the jail on those charges?

25        THE PLAINTIFF:  Yes.

```
 1          THE COURT:  And if I read correctly, the events in
 2   your complaint that you're talking about occurred in 2023;
 3   is that right?
 4          THE PLAINTIFF:  That's right.
 5          THE COURT:  If I'm reading your complaint correctly,
 6   the first event that you talk about took place, I believe in
 7   October?
 8          THE PLAINTIFF:  October 25th.
 9          THE COURT:  October, you say 25th?
10          THE PLAINTIFF:  Yeah.  I believe it was the 25th.  I
11   know it was a Thursday.  It's been a while.
12          THE COURT:  Pardon?
13          THE PLAINTIFF:  I said it's been a while.  I know it
14   was a Wednesday in October --
15          THE COURT:  Okay.
16          THE PLAINTIFF:  -- I think the 25th.
17          THE COURT:  I think you said October the 24th in the
18   complaint, but whether it's October 24th or 25th, that's
19   close enough for us to move forward.
20          All right.  So you were at the jail on that day, and
21   I believe you said that you were at some point Tased.  And I
22   read your complaint, and I thought you said that you had,
23   for whatever reason, left your cell or housing unit.  Is
24   that true?
25          THE PLAINTIFF:  That's true.
```

```
 1          THE COURT:  And were you authorized to do so?
 2          THE PLAINTIFF:  Not at the moment.
 3          THE COURT:  So that's a "no"?
 4          THE PLAINTIFF:  Well, no, it really was nobody to --
 5          THE COURT:  Pardon?
 6          THE PLAINTIFF:  There wasn't no guard or no -- no one
 7     staff around to even assist me.
 8          THE COURT:  And so you left your housing unit for
 9     what purpose?
10          THE PLAINTIFF:  For safety purposes.
11          THE COURT:  All right.  And then you encountered, I
12     suppose, Officer Scott?
13          THE PLAINTIFF:  Scott, yes.
14          THE COURT:  Tell me what happened.
15          THE PLAINTIFF:  Well, when he seen me, he told me --
16     first, he was like what I was doing over there, and he told
17     me turn around and put my hands behind my back.  But he, as
18     soon as he seen me, he had pulled the Taser out and put it
19     to my head.  You know, he scared me at that moment --
20          THE COURT:  Sir, I didn't understand that.  You're
21     going to have to repeat that.
22          THE PLAINTIFF:  Oh.  I said when Scott came over
23     there where I was, as soon as he seen me, he immediately
24     pulled his Taser and put it to my head and told me to turn
25     around and put my hands behind my back.
```

1          And that's when I kind of froze up and just put my

2    hands up, and I was telling him why he got the Taser at my

3    head?  And as I was backing back trying to I guess just --

4    just try to get him to stop and not to Tase me.

5          THE COURT:  But at that point, he had not Tased you?

6          THE PLAINTIFF:  Not yet.

7          THE COURT:  Okay.  You can keep going.  Tell me what

8    happened.

9          THE PLAINTIFF:  Oh.  Yeah.  And as I was backing up

10   telling him or asking him why he got the Taser at my head,

11   what he's doing.  When I looked -- when I kind of blinked

12   and looked off, that's when he had shot me with the Taser.

13         THE COURT:  All right.  So he hit you with the Taser.

14   Then what happened?

15         THE PLAINTIFF:  Well, I fell on the floor.  The first

16   Tase, I fell on the floor, and then when he let it go --

17   like, it's a Taser that clip on and you can hold the trigger

18   and let it go at your will, but it still be clipped to you.

19   And so the first time --

20         THE COURT:  You're mumbling a good bit.  I've got to

21   hear this.  So take your time and speak as clearly as you

22   can, because I want to understand.

23         THE PLAINTIFF:  Yeah.  I was letting you know, like,

24   the first time he Tased me, the Taser, it clips on you and

25   sticks to you, and you can hold the trigger and let it go at

1    your will.

2         And so the first time he Tased me as I was backing

3    up, that's when I fell to the floor.  And when he let the

4    trigger go the first time, that's when I told him -- well, I

5    had asked him, I was, like, what you Tasing me for?

6         And he told me shut the F up and turn around and lay

7    on my stomach and put my hands behind my back.  But when he

8    said that, he pressed the trigger again for the Taser and

9    started Tasing me again.  And that's when I feeled -- I

10   rolled on over to my stomach and put my hands behind my

11   back, and I had looked up at him, and he told me ride it.

12   He said "ride it" and just hit the trigger again and hit it

13   till I urinated on myself on the floor in the pod right

14   there.

15        And then when he got finished, he told two more

16   officers come take me to the -- to the pod to lockdown, and

17   I had went to lockdown.

18        THE COURT:  All right.  So they placed you into

19   lockdown after that episode?

20        THE PLAINTIFF:  Yes.

21        THE COURT:  And then what happened?

22        THE PLAINTIFF:  Well, I stayed in lockdown that was,

23   like, for 24 hours.  I think you're supposed to have a day

24   out or something, but they kept me in lockdown for 24 hours.

25   And I was telling them I needed to see a nurse or something

1   like that, because I had burn marks on my chest from the

2   Taser.  And, yeah, I stayed in lockdown for 24 hours for,

3   like, 15 days straight.

4        And then he let me out for one day, and he came --

5   and that was Scott, he came up in the pod that day right

6   there.

7        THE COURT:  I didn't hear that.

8        THE PLAINTIFF:  Oh.  I said I stayed in lockdown for

9   15 days straight for 24 hours, and they let me out for one

10  day.  That was my first day being out the -- out the cell

11  from lockdown.

12       And I seen Scott.  He came over there that day; I

13  seen him.  He pointed the Taser at my head again that day, I

14  guess to intimidate me or threaten me or whatever.  And he

15  let me finish my hour out -- my hour -- we supposed to get

16  an hour outside the pod for us in lockdown.  He let me

17  finish my hour, take a shower, and went on -- went on and

18  left.

19       And that day, I think I stayed in lockdown for maybe

20  another 15 days.  But I was -- after the 15th day, I was

21  able to come out for an hour a day as I had supposed to.

22  And, yeah, after about 15 days, that's when they let me go

23  back to regular population in my regular pod I was in, and

24  that was -- it was close to November, Thanksgiving, because

25  I think it was, like, a week later, I had ordered

```
 1    commissary, like, a week later.  And that's when another

 2    officer, Tyler, he came and searched my cell; I had made

 3    commissary that day --

 4         THE COURT:  When you're talking about commissary, you

 5    bought some things?

 6         THE PLAINTIFF:  Bought food -- bought food.  I

 7    already had commissary.  I had bought food and had my

 8    commissary stuff in my cell, and we was locking down this

 9    day.  And he came and searched my cell, and he found a phone

10    in there.  And he was just, like, who phone is this?

11         I ain't know who phone it was, but they reprimanded

12    that case to the file because he had charged me with the

13    phone but --

14         THE COURT:  But he found the phone in your cell?

15         THE PLAINTIFF:  Yes.

16         THE COURT:  Okay.  Go ahead.

17         THE PLAINTIFF:  Yes.  And my roommate -- my roommate

18    was able to stay, but they sent me to lockdown and they took

19    all my commissary and all my belongings at that time.  But

20    they separated, because they put me in handcuffs and took me

21    on to lockdown and put me in a cell with feces and blood all

22    over the wall and stuff like that.  And they ain't give me

23    no mat or nothing to sleep on, so I had to sleep on the

24    floor that night in the cell.

25         That's when I went back to lockdown and I was asking
```

1   them about my commissary and the things I had in my cell,

2   and I just never got it.

3        Scott came -- I think Scott maybe came and brought

4   me, like, a mat.  But the rest of my belongings I had

5   bought, my food, my hair lotion, and all my products and

6   things like that, I never have seen that again.  But I did

7   see them pack it up.  I just never -- never have seen it no

8   more.

9        THE COURT:  Okay.  So when you went to lockdown this

10  time after the phone, how long were you there?

11       THE PLAINTIFF:  I wasn't in there that long this

12  time, maybe like a week -- a week or so.

13       THE COURT:  All right.  And then -- and you say

14  Officer Scott brought you a mat?

15       THE PLAINTIFF:  Yes, sir, Scott had -- Scott brought

16  me a mat.

17       THE COURT:  Is that to sleep on?

18       THE PLAINTIFF:  That's just to sleep on, the next

19  day.

20       THE COURT:  All right.  Well, let's go through -- I

21  want to go through those claims a bit and figure out how all

22  these people are involved.

23       You indicated, I think in your materials, you thought

24  your commissary items were about $350?

25       THE PLAINTIFF:  Yes.

1          THE COURT:  Do you have any kind of way of

2    determining exactly what they are?

3          THE PLAINTIFF:  Well, the only way that I know it's

4    able to be done, I'd have to call down -- I'd have to call

5    to the jail, and they'd maybe have to give me, like, a

6    commissary sheet or something -- or something like that.

7          THE COURT:  I was just curious if you had a record of

8    it.  I can require them to produce whatever records they

9    have on it.  I was just wondering, do you have any?

10          THE PLAINTIFF:  Oh, no, I don't have --

11          THE COURT:  Okay.

12          THE PLAINTIFF:  -- anything for that.

13          THE COURT:  All right.  So let's go through the

14    parties you've sued one by one.

15          Now, have you told me the events that led you to file

16    the lawsuit?  Do you feel like you've had a chance to

17    explain what happened?

18          THE PLAINTIFF:  Yes.

19          THE COURT:  Okay.  So --

20          THE PLAINTIFF:  But I can explain it more if you need

21    more detail about anything --

22          THE COURT:  Well, if there's any detail you want to

23    add, I don't mind you adding it.  I just want to make sure

24    I've got it.

25          I'm going to go through all the people you've sued

1    and make sure I understand how they fit into here.  You've

2    got a lot of people in here, and I want to make sure they

3    really need to be in here.

4          Now, you've sued Tyree Jones.  I believe he was the

5    sheriff; right?  Now, why did you sue him?

6          THE PLAINTIFF:  Well, I added Tyree Jones because

7    he's the head of the department of all the officers, and

8    basically this his facility.  And so what happened to me, I

9    feel like he's responsible because of the officers that's

10   working up there.

11         THE COURT:  Okay.  Now, was Tyree Jones present when

12   any of these events occurred?

13         THE PLAINTIFF:  No, he wasn't present.

14         THE COURT:  Was he involved in any way that you know

15   of?

16         THE PLAINTIFF:  I'm not sure.  No.

17         THE COURT:  Okay.  Did you ever talk to him about

18   these things?

19         THE PLAINTIFF:  I haven't.

20         THE COURT:  Pardon?

21         THE PLAINTIFF:  I have not.

22         THE COURT:  So you're suing him because he's in

23   charge basically, and in your opinion, he should be

24   responsible for what happens there.

25         THE PLAINTIFF:  Right.

1          THE COURT:  Is that --

2          THE PLAINTIFF:  Yes.

3          THE COURT:  I don't want to put words in your mouth,

4    but I want to make sure I understand what you're telling me.

5          THE PLAINTIFF:  Yes, that's correct.

6          THE COURT:  All right.  Thank you.

7          All right.  Let's move to Officer Tyler, Nelson

8    Tyler.  You mentioned him I think at least once.  Who is he

9    and what are you claiming he did that leads you to sue him?

10          THE PLAINTIFF:  Tyler Nelson, he was -- he was the

11    guy that searched my cell and told me to -- and found a

12    cellphone and told me to go to lockdown.

13          THE COURT:  All right.  Well, what is it that he did

14    that was wrong in your mind?

15          THE PLAINTIFF:  Well, he's the one -- he told me --

16    he loaded all my commissary and all my items that was in my

17    cell, he's the one put it all in one bag, had me thinking

18    they was going to bring it to me in lockdown, but he never

19    brought it.  But he's the one loaded all my things in one

20    bag, and I know he had possession of all my items that was

21    in my cell.

22          THE COURT:  So if I understand it, you believe he's

23    the person that should be responsible for your commissary

24    items being taken and not returned to you?

25          THE PLAINTIFF:  Yes.  And he's the one told Terrell

```
 1   Thornton, like, both of them came and searched the cell.  So

 2   Officer Nelson, he's the lieutenant, and he's the one told

 3   Terrell Thornton to take me to lockdown.  And now --

 4        THE COURT:  Who did?

 5        THE PLAINTIFF:  Say it again?

 6        THE COURT:  Who did?

 7        THE PLAINTIFF:  Terrell -- I mean, Nelson, Tyler

 8   Nelson the one that told Terrell Thornton to take me to

 9   lockdown.

10        THE COURT:  And for what reason?

11        THE PLAINTIFF:  Because they had found a cellphone in

12   my cell.

13        THE COURT:  Was there anything wrong about that?

14        THE PLAINTIFF:  Yeah, we shouldn't have no cellphones

15   or nothing like that.  But the thing about it was, it wasn't

16   mine, and he never asked my cellmate.  But I was the only

17   one to go to lockdown that day.

18        THE COURT:  All right.  So the two things about Tyler

19   that you're complaining about is that he sent you to

20   lockdown and also confiscated your commissary items?

21        THE PLAINTIFF:  Yes.

22        THE COURT:  Is that a fair statement of why you're

23   suing him?

24        THE PLAINTIFF:  Yes, all my property and my

25   commissary.
```

1          THE COURT:  I'm sorry?

2          THE PLAINTIFF:  I said all of my property and my

3     commissary.

4          THE COURT:  All right.  And your property and your

5     commissary consisted generally of what?  Give me a general

6     description of what was involved.  You mentioned food, but

7     what else?

8          THE PLAINTIFF:  Like, towels, boxers, shirts,

9     socks, --

10          THE COURT:  Clothing items?

11          THE PLAINTIFF:  -- and hygienes, deodorant, like,

12     combs, brushes, all type of my personal hygiene stuff.

13          THE COURT:  All right.  Thank you.  Let's move to the

14     next person, Sergeant John Scott.  Now, how did -- you

15     mentioned him early on as being the person --

16          THE PLAINTIFF:  That had Tased me --

17          THE COURT:  -- that Tased you.

18          THE REPORTER:  Mr. Battle, please let the Judge

19     finish before you start to answer, so that way I can get

20     both of you down.

21          THE COURT:  Thank you.  She's writing down everything

22     we say, and when you and I talk at the same time, it's

23     impossible for people to do it.  So I'll try to do a better

24     job of not talking while you're talking.  If you will, let

25     me finish.  It's hard to do sometimes.

1          All right.  He is the one that you mentioned early

2    on, on either October 24th or 25th of 2023 had Tased you

3    when you were out of your cell, and you've covered that.

4    And I know you're alleging that he Tased you and used

5    excessive force with that Tasing, so I understand that.

6          Are there any other reasons you're suing him, other

7    than that?

8          THE PLAINTIFF:  No, that's it.

9          THE COURT:  All right.  Well, there may be another

10   one that I want to cover, though.  You mentioned that you

11   asked for medical attention and didn't get it?

12         THE PLAINTIFF:  Yes.

13         THE COURT:  Now, did you ask him for that?

14         THE PLAINTIFF:  Not at -- well, at that time after I

15   got Tased, I had told him, like, he was talking to me, but

16   like I had -- my brain, I don't know.  Like, I -- I was

17   feeling discombobulated.  I couldn't even think at the

18   moment at that time.

19         But after I laid down and woke up, I seen I was in

20   lockdown.  And after that, I had -- that's when I seen my

21   chest with the burn marks and stuff, and I was trying to ask

22   for medical attention.  But, no, I wasn't let out the cell

23   for 15 days after that.

24         THE COURT:  Say that last part again.

25         THE PLAINTIFF:  Oh, I wasn't -- like, I had went to

```
 1   lockdown, and I wasn't let outside my cell after -- after
 2   15 days; I was in there 24 hours.
 3          THE COURT:  But the medical attention you were
 4   interested in, you didn't ask him about it at the time?
 5          THE PLAINTIFF:  I really can't just exactly remember.
 6   I may have.  I may have, but...
 7          THE COURT:  All right.  Now, I understand and you've
 8   explained to me you thought the medical attention you needed
 9   was to be seen about the burn marks.  I'm a little familiar
10   with how that works when you get hit with Tasers or items,
11   it can leave a mark and break the skin and the electrical
12   shock can cause scabbing and that kind of thing.
13          Is that what you experienced?
14          THE PLAINTIFF:  Yes.
15          THE COURT:  Did it heal?
16          THE PLAINTIFF:  It healed.
17          THE COURT:  Do you have any long-term problems
18   because of that?
19          THE PLAINTIFF:  Yes.
20          THE COURT:  What are they?
21          THE PLAINTIFF:  They're mental -- mental.
22          THE COURT:  Well, I know that upset you.  I'm talking
23   about did the scars heal?
24          THE PLAINTIFF:  It's basically healed mostly.
25          THE COURT:  Okay.  When you say "mostly," is there
```

1    any part that's not healed about it?

2         THE PLAINTIFF:  Well, I have permanent just --

3         THE COURT:  Pardon?

4         THE PLAINTIFF:  I haven't examined it just directly

5    later, but...

6         THE COURT:  Well, okay.  You know, to sue over lack

7    of medical treatment, it's got to be something that's

8    serious and not something that you just prefer.  I mean, I'm

9    familiar with the -- the situation, but you were able to

10   heal up without medical attention?

11        THE PLAINTIFF:  Yes.

12        THE COURT:  Okay.  All right.  Let's move then to

13   James Dotson.  Who is he, and why are you suing him?

14        THE PLAINTIFF:  Because James Dotson, he moved -- he

15   moves the inmates in from the cells from different cells and

16   pods, and he came to me the next -- the next day I believe

17   after the Taser situation.  And he was telling me just tell

18   him everything that happened, and he was going to let me out

19   of lockdown.

20        And so I explained to him what happened and why I had

21   left out of my pod to the other pod for safety reasons and

22   things like that, and basically he just put me back in the

23   pod and did nothing about it.

24        THE COURT:  So you thought he was going to help you,

25   but he didn't?

```
 1              THE PLAINTIFF:  Yeah.  Yes.

 2              THE COURT:  Was he required to do anything?

 3              THE PLAINTIFF:  I believe so.

 4              THE COURT:  Did he have the authority to do that?

 5              THE PLAINTIFF:  I think he did.

 6              THE COURT:  You think he did?

 7              THE PLAINTIFF:  I think he do.

 8              THE COURT:  You don't know one way or the other,

 9      though, do you?

10              THE PLAINTIFF:  I really don't.

11              THE COURT:  Okay.  All right.  But Dotson's

12      involvement was he came to see you, tried to figure out the

13      situation, said he would help, and you thought he would.

14      But ultimately, he couldn't get you out of lockdown or

15      didn't get you out of lockdown?

16              THE PLAINTIFF:  Yes.

17              THE COURT:  Is that a fair statement?

18              THE PLAINTIFF:  That's a fair statement.

19              THE COURT:  Okay.  Any other reason you're suing

20      Dotson, other than that?

21              THE PLAINTIFF:  That will be all.

22              THE COURT:  Okay.  All right.  Then let's move to

23      Officer Brittany Milton.  Who is she, and why are you suing

24      her?

25              THE PLAINTIFF:  She's one of the officers at the --
```

1    at the -- in Raymond.  And she came one night -- she's one

2    of the officers that came and stopped by my cell when I was

3    in lockdown, and that was the first 15 days I was in

4    lockdown.  And she came and stopped by my cell, and I did

5    the -- I was telling her what happened to me under the -- I

6    had to talk to her under the door, because I was in

7    lockdown.

8         So I was yelling through the door telling her

9    everything that happened and how I got Tased and everything

10   like that.  I was thinking she would help or maybe she

11   could; I don't know.  Just she was the first one to come

12   through a few days later, and I still received no help.

13        THE COURT:  So you're suing her because you mentioned

14   to her that you had a problem, and she didn't help?

15        THE PLAINTIFF:  Yes.

16        THE COURT:  Okay.  What were you expecting her to do?

17        THE PLAINTIFF:  Maybe -- maybe be able to talk to one

18   of the other guards -- one of the other guards or the

19   lieutenants at the facility and help me get out of lockdown,

20   or try to help me see what's going on with the situation;

21   why -- why I was in lockdown, why I was in there 24 hours a

22   day, not getting an hour, or just anything to try to help my

23   situation.

24        THE COURT:  All right.  I know when you're in that

25   situation, it can be difficult.  But is it your belief that

```
 1   anybody that walked by that you mentioned something to had
 2   an obligation to resolve whatever problem you mentioned?
 3            THE PLAINTIFF:  Well, she was the first to come and
 4   stop, and I just tried.
 5            THE COURT:  Okay.  I understand.  All right.  But is
 6   that the reason you sued Officer Milton?
 7            THE PLAINTIFF:  Yes.
 8            THE COURT:  What about Terrell Thornton; I don't
 9   think Thornton is before the case.  It's been difficult
10   trying to identify that person.  But what is it -- who is
11   he, and what do you claim he did or didn't do that leads you
12   to sue him?
13            THE PLAINTIFF:  Yeah.  He was the guy that when
14   Nelson Tyler had told him to take me to lockdown when they
15   found the cellphone, and he put me -- he put me in the cell
16   with feces and blood on the walls and on the floors and
17   stuff like that with no mat that night.
18            THE COURT:  But other than that, what?
19            THE PLAINTIFF:  I said he the one that put me in the
20   cell with the feces on the walls and the blood all over the
21   cell and on the floors with no mat.  He's the one had put me
22   in that cell right there.
23            THE COURT:  All right.  So he put you in a cell that
24   didn't have a mat, but Officer Scott brought you a mat the
25   next day?
```

```
 1            THE PLAINTIFF:  Yeah, the next day.

 2            THE COURT:  But you said there was blood and feces?

 3            THE PLAINTIFF:  On the walls and on the floor.

 4            THE COURT:  Describe that to me.  What did you see?

 5            THE PLAINTIFF:  Well, like, when you look at the

 6    walls, it's feces rubbed all over the walls and blood --

 7    blood on the floor.  Feces on the walls and blood on the

 8    floors and on the toilet.

 9            THE COURT:  Did you become ill?  Did you seek medical

10    treatment?

11            THE PLAINTIFF:  Yes, I threw up.

12            THE COURT:  You threw up?

13            THE PLAINTIFF:  I did.

14            THE COURT:  All right.  And how long were you in the

15    cell?

16            THE PLAINTIFF:  The whole time?

17            THE COURT:  No, the one with the feces --

18            THE PLAINTIFF:  The feces?

19            THE COURT:  -- and blood.

20            THE PLAINTIFF:  I was only in there maybe -- maybe a

21    week.  I had broke the window -- broke the window in the

22    cell and had squeezed up out of there to get in another

23    cell.

24            THE COURT:  Say that again.

25            THE PLAINTIFF:  I had -- I had to break the window in
```

1    the cell, jail cell, and I had to squeeze out of there and

2    get -- get me another cell.

3            THE COURT:  Okay.  You squeezed out of that cell into

4    another cell after a few days?

5            THE PLAINTIFF:  About a week or so, yeah.

6            THE COURT:  Okay.  All right.  Thank you.  And that's

7    the reason you sued Thornton?

8            THE PLAINTIFF:  Yes.

9            THE COURT:  All right.  I think we've covered

10   everybody that you've sued.  I don't think I've left anybody

11   out, but if I have, the parties will let me know.

12           Okay.  So I understand you've filed a lawsuit.  What

13   is it you're asking the Court to do?

14           THE PLAINTIFF:  Well, I was asking for the Court to

15   grant me something for my pain and suffering for the time I

16   had just been incarcerated.

17           THE COURT:  All right.  So damages, money damages, is

18   that what you --

19           THE PLAINTIFF:  Money damages.  Yes, I have money --

20   I have money losses.

21           THE COURT:  And what are your money losses?

22           THE PLAINTIFF:  Well, I don't know the whole total

23   from when the time my commissary had got taken.  I don't

24   know the exact total, but I was thinking it was maybe a

25   thousand dollars or something for that right there.

```
 1          THE COURT:  All right.  I think I have the gist of
 2    the claim.  Now, let me ask the defendants -- I'm not going
 3    to allow you to depose him.  But if you require or want a
 4    clarification of some of the allegations, tell me what it
 5    is, and I'll get that clarification.
 6          MR. COWAN:  I don't have any questions, Your Honor.
 7          THE COURT:  All right.  Thank you, Mr. Cowan.
 8          MR. KIHM:  No questions.
 9          THE COURT:  All right.
10          MR. BOYD:  Yes, Your Honor, just very briefly.
11          THE COURT:  Direct that to me, and then I'll filter
12    it.
13          MR. BOYD:  Yes, Your Honor.  We'd like to inquire as
14    to how the -- the -- kind of the amount of blood and feces
15    that was in the cell the plaintiff alleges he was put in to
16    and whether anybody -- what's his basis for saying that was
17    blood and feces on the wall.
18          THE COURT:  Okay.  And the question I think is:  What
19    was the extent of the content; how much blood and feces was
20    on the walls?
21          THE PLAINTIFF:  It was -- it was -- it was
22    unbearable.  Like, I hardly could breathe in there without
23    smelling it and stuff like that.  I couldn't use the toilet
24    because it was blood -- it was blood on the toilet and stuff
25    like that and --
```

1          THE COURT:  Was it dried?

2          THE PLAINTIFF:  Say it again.

3          THE COURT:  Was it old?  Was it dried?

4          THE PLAINTIFF:  It was -- it was -- it looked as if

5    some was dry and some wasn't as old.

6          THE COURT:  And I think the question, too, is how do

7    you know that was blood or feces; was that the question?

8          MR. BOYD:  Yes, Your Honor.

9          THE COURT:  Okay.

10          THE PLAINTIFF:  Oh, because, well, you could smell

11    the feces.  You could smell the feces that was on the wall.

12    And, like, it wasn't no light in the cell, but when the sun

13    comes up and shines in the cell, you could see -- you could

14    see the blood -- the blood and stuff.

15          And then it was another guy in the pod next to me.

16    He was telling me the same thing, there was a dude bleeding

17    in that cell, and they had took him out of there.

18          THE COURT:  All right.  Does that require further

19    clarification?

20          MR. BOYD:  Just whether any Hinds County employees

21    told him it was blood and/or feces.

22          THE COURT:  Did anybody tell you that it was blood or

23    feces, or was that something you determined on your own?

24          THE PLAINTIFF:  They -- they already knew.  I think

25    that was pretty --

1          THE COURT:  Now, don't tell me what other people

2    know.  Did anybody tell you -- I mean, you don't know what

3    other people know.  Did anybody tell you that it was blood

4    or feces is what he was asking?

5          THE PLAINTIFF:  No, nobody told me.

6          THE COURT:  All right.  Further?

7          MR. BOYD:  Yes, Your Honor.  Regarding the reason

8    that he was placed in lockdown by Lieutenant Nelson, we'd

9    like to inquire as to whether he knew his cell -- he knew of

10   the existence of the cellphone prior to the encounter with

11   Lieutenant Nelson and whether he reported his cellmate as

12   having that cellphone, if the phone didn't belong to the

13   plaintiff.

14         THE COURT:  Did you know about the phone before they

15   showed up and seized it?

16         THE PLAINTIFF:  No, I did not.

17         THE COURT:  Do you know anything about whose phone it

18   was?

19         THE PLAINTIFF:  No, I didn't.

20         THE COURT:  How the phone got there?

21         THE PLAINTIFF:  No.

22         THE COURT:  Other clarifications?

23         MR. BOYD:  Your Honor, regarding his claim for lost

24   commissary and his personal property, we'd like to know if

25   the basis for the claims against Lieutenant Nelson is just

1    because he -- he was the one that bagged the property, or

2    whether he's alleging that Lieutenant Nelson actively lost

3    or threw his property away or something to that effect?

4         THE COURT:  All right.  I understand that question.

5         You had mentioned that Lieutenant Nelson had gotten

6    your property together and bagged it up and you didn't get

7    it.

8         THE PLAINTIFF:  True.

9         THE COURT:  Are you claiming that he -- he, though,

10   lost it or stole it or was responsible for it not getting to

11   you in some way?

12        THE PLAINTIFF:  Yes.

13        THE COURT:  Tell me what you're claiming he did.

14        THE PLAINTIFF:  Well, since he's the one that did bag

15   it up, I do hold him responsible for getting it.

16        THE COURT:  No, I'm not asking you who you hold

17   responsible.  The Court will determine who's responsible

18   when the time comes.  What we're trying to get is the facts;

19   and that is, what do you know?  Do you know what he did with

20   the property once it was bagged up?

21        THE PLAINTIFF:  No, sir.

22        THE COURT:  I see.  Do you know who was responsible

23   for the property once it was bagged up?

24        THE PLAINTIFF:  No, sir.

25        THE COURT:  Do you know who got it again, where it

1  went to?

2        THE PLAINTIFF:  I do know they told me they put it

3  in -- in the tower.  They told me they put it in -- I don't

4  remember exactly if it was Thornton -- I believe it was

5  Thornton, because he's the one that took me.  He's the one

6  that came back to lockdown.  But I believe Thornton the one

7  told me they put my property in the tower, but I never seen

8  it.

9        THE COURT:  But you never got it?

10        THE PLAINTIFF:  I never got it, no.

11        THE COURT:  Okay.  Just the long and the short of it

12  is, you don't know, once it was bagged up, what happened to

13  it?

14        THE PLAINTIFF:  True.

15        THE COURT:  I get your point.  You know that it was

16  bagged up and you never got it.  I get that.  But you're not

17  telling me you know exactly who did what with it; right?

18        THE PLAINTIFF:  Right.

19        THE COURT:  That, you don't know.  Okay.

20        MR. BOYD:  That's all the questions, Your Honor.

21        THE COURT:  All right.  Okay.  Well, let's move then

22  to discovery.  I entered an order outlining what I was going

23  to do here at the hearing.  And you got that order or you

24  wouldn't be here; telling you to be here and be prepared to

25  talk about your claims and how you're going to prove them

1  and that kind of thing.

2       And also I want to talk about discovery.  Now,

3  discovery is the process by which parties obtain information

4  before the case is tried, and most folks don't know how to

5  do discovery, especially nonlawyers.  And so we come in and

6  try to figure out what information you wanted or needed, so

7  it can get produced.  And there are certain things I think I

8  would require the defendants to produce to you.

9       One, if there's any incident report about the phone

10  or Tasing incident, that ought to be produced, so he can

11  have the information on that.

12       If he was subject to a disciplinary process because

13  of the phone and the cell or being out of the cell at the

14  time he was Tased, that should be produced.

15       If there are any records showing what commissary

16  items he purchased prior to being taken, those should be

17  produced, so we can figure out what it was.  If there's an

18  inventory of the items in his cell that were bagged up, that

19  should be produced.

20       Did you receive any medical treatment while you were

21  at the jail?

22       THE PLAINTIFF:  No, sir.

23       THE COURT:  Did you make any written request for any

24  medical treatment?

25       THE PLAINTIFF:  Well, at that time in Raymond, they

1   didn't have -- they didn't have nothing like that.

2       THE COURT:  I didn't ask what you believe they have

3   or didn't have.  I asked did you make a written request at

4   any time for medical treatment?

5       THE PLAINTIFF:  No, sir.

6       THE COURT:  All right.  Now, I understand your point,

7   but I also want to understand what the facts are.

8       If you filed any request for administrative remedies

9   through any program that was available at the jail, that

10  should -- those should be produced.  If there are -- is a

11  document, a jail file, showing when and where he was housed,

12  so we will know the housing unit and the lockdown cells and

13  those kind of things, those should be produced; that is,

14  where he was during the relevant time periods.

15      Those are the things I think you would want and that

16  would be useful to either support or defeat your claims.  I

17  don't know, maybe they help them, maybe they don't.  But

18  those things would seem to be relevant to your case.

19      Do you agree?

20      THE PLAINTIFF:  I agree.

21      THE COURT:  Are there other records relating to your

22  case I have not mentioned that you would be requesting?  If

23  so, I'll try to deal with that now.

24      THE PLAINTIFF:  I can't -- I can't think of nothing

25  else at the moment.

```
1          THE COURT:  All right.

2          THE PLAINTIFF:  But if I could -- if I do think of

3     something down the line, is there a way that I could ask

4     you?

5          THE COURT:  No, I don't require the parties to have

6     memorized that list; the things I'm going to do will be in

7     an order.  But are there any objections or concerns about

8     the production of any of those records I just mentioned?

9          MR. BOYD:  No objection, Your Honor.

10         THE COURT:  All right.

11         MR. COWAN:  No objection.

12         THE COURT:  All right.  I'll place those in the

13    order, and I'll direct those to be produced within 30 days.

14    If there is an objection, they should be filed of record at

15    the time of production.  And I would need a notice of

16    service filed of record that the records that were ordered

17    produced were, in fact, produced; or if not, to say so and

18    the reasons why.

19         Are there any particular records that the defense

20    requires of the plaintiff?

21         MR. COWAN:  No, Your Honor.

22         MR. BOYD:  No, Your Honor.

23         THE COURT:  All right.  Thank you.

24         And that will be sufficient discovery for the case.

25    No other discovery ought to be permitted, unless you request
```

1    leave to do so in writing, and then I can address it.

2        All right.  Here's the way the case will go, so

3    you'll kind of get an idea of what will happen.  After this

4    hearing sometime in the next week or so, you'll get an order

5    from me, and it was say "Omnibus Order".

6        Now, "omnibus" is just a fancy word that means it

7    covers a lot of stuff, that's all it means.  And it's going

8    to outline the claims you've made today.  It's going to

9    direct the defendants to produce the records that we just

10   talked about.  It's going to set some other case deadlines

11   and things like that, and I'll cover that in a minute.

12        I'll set a motions deadline for, say, 90 days out.

13   You'll get that in about a week or so.  Then not much is

14   going to happen until sometime in the next 30 days, they're

15   going to produce these records to you, and they're going to

16   mail them to you most likely at whatever address you have of

17   record.  So whatever address you've filed with the court is

18   the one they're going to send them to, which I think was on

19   Colonial Drive; is that right?

20        THE PLAINTIFF:  That's right.

21        THE COURT:  205 Colonial Drive, Jackson; is that

22   right?

23        THE PLAINTIFF:  Yes.

24        THE COURT:  All right.  That's also where the Court's

25   going to be mailing things to you.  So if you change your

1   address, you need to file a notice with the court, because

2   otherwise we're going to keep sending things to that

3   address.  And if they come back and we can't find you, your

4   case could be dismissed.  So if you change your address,

5   make sure you notice it and tell us in writing.

6        Will you do that?

7        THE PLAINTIFF:  I will.

8        THE COURT:  All right.  Then sometime between after

9   those documents are produced and 90 days from now, as night

10  follows day, these lawyers are going to file a motion to

11  dismiss some or all of your case as being either factually

12  or legally insufficient.

13       If a motion is filed -- and a motion is just a

14  written request for the Court to do something -- you have

15  two weeks, that's the rule, two weeks to respond to the

16  motion, 14 days.  So if they file a motion and you don't

17  agree with it, you need to get me a response filed; that is,

18  file it with the Clerk of Court within two weeks.

19       Otherwise, it will get ruled on without your

20  response, and if your side's not represented, you usually

21  can't win.  So make sure if you want to respond to a motion,

22  you do that within two weeks.

23       Will you do that?

24       THE PLAINTIFF:  I will.

25       THE COURT:  Once the motions are ruled on, if the

 1  case is not dismissed or if it's only dismissed in part,

 2  we'll then have a trial on the matters that haven't been

 3  dismissed.  So we've got to jump through a lot of hoops to

 4  get there:  The omnibus order, production of records,

 5  motions.  Once we get past all that, the matter can be set

 6  for trial.

 7        And then when the trial happens, it will be your

 8  obligation, not theirs, to prove your case with witnesses

 9  and documents and that kind of thing.  So that's the way it

10  will take place.

11        Do you have any questions about that?

12        THE PLAINTIFF:  No, sir.

13        THE COURT:  All right.  And the trial, if one is

14  held, would be here in this courthouse.  Probably not in

15  this very courtroom, but one of these in the courthouse

16  here.

17        All right.  Hang on a second.  I don't see anything

18  else we need to address at this time.

19        On behalf of the defendants, any other issues you

20  want to address?

21        MR. COWAN:  No, Your Honor.

22        MR. BOYD:  No, Your Honor.

23        THE COURT:  Okay.  Again, I think I've asked, but

24  I'll ask again.  Do you have any more questions you want to

25  ask?

1        THE PLAINTIFF:  Did you ask -- could you ask, could

2   the video be produced for them days it happened that I said

3   it happened on?

4        THE COURT:  Yeah.  If there's a video of the Tasing

5   incident, I could require that to be produced if there is

6   one.  But I don't know about -- what other video would you

7   want, other than that?

8        THE PLAINTIFF:  Yeah, that would be the one right

9   there.

10        THE COURT:  All right.  If there is a video, it

11   should be produced, so that will be added.

12        Okay.  That's a good question, and I appreciate you

13   asking.

14        Okay.  If there's not -- if there's nothing further,

15   we'll conclude the hearing, and I'll get an omnibus order

16   out hopefully in the next week or so.  It shouldn't take

17   long.

18        I'd like the parties to remain a few minutes if they

19   would.  I want to visit with the parties to see if there's a

20   way to resolve the case, and if it is, let you guys talk.  I

21   don't want to be too involved in that since it's a consent

22   case, and I may have to decide it.

23        But I do want to talk with you to see -- or at least

24   have the parties engage for a minute to see if you can

25   resolve your differences.  So that will conclude the

1   hearing, but I'd ask the parties to remain.

2        All right.  Thank you.

3   ************************************************************

1　　　　　　　**CERTIFICATE OF COURT REPORTER**

2

3　　　　I, Candice S. Crane, Official Court Reporter for the

4　United States District Court for the Southern District of

5　Mississippi, do hereby certify that the above and foregoing

6　pages contain a full, true, and correct transcript of the

7　proceedings had in the forenamed case at the time and place

8　indicated, which proceedings were stenographically recorded

9　by me to the best of my skill and ability.

10　　　　I further certify that the transcript fees and format

11　comply with those prescribed by the Court and Judicial

12　Conference of the United States.

13　　　　THIS, the 28th day of July, 2025.

14

15　　　　　　　　　　/s/ Candice S. Crane, RPR, RCR, CCR

16　　　　　　　　　　Candice S. Crane, RPR, RCR, CCR #1781
　　　　　　　　　　　Official Court Reporter
17　　　　　　　　　　United States District Court
　　　　　　　　　　　Candice_Crane@mssd.uscourts.gov
18

19

20

21

22

23

24

25